## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MARILYN RUMSEY,

                **Plaintiff,**

    **v.**

UNITED STATES DEPARTMENT OF
THE ARMY,

                **Defendant.**

**Case no. _CIV-20-556-SLP_**

**Complaint and
Jury Demand**

### PRELIMINARY STATEMENT

1. This is an action under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq. (the "Rehabilitation Act"), based on physical disability.

2. Plaintiff Marilyn Rumsey was employed by the United States Department of the Army at the Reynolds Army Health Clinic from August 15, 2011 until her constructive discharge on December 31, 2018.

### PARTIES

3. Plaintiff Marilyn Rumsey is a citizen of the United States and a resident of Comanche County, Oklahoma.

4. Plaintiff Ms. Rumsey is a Licensed Counselor of Social Work ("LCSW").

5. She applied for and accepted a position as a Social Worker, YA-0185-02 (equivalent to GS-11 position under the previous personnel system), Department of Behavioral Health, Reynolds Army Health Clinic, Fort Sill, OK on August 15, 2011.

6. Complainant accepted another position as a Social Worker, GS-0185-12, Department of Family Practice, Reynolds Army Health Clinic, Fort Sill, OK on August 26, 2012.

7. In Family Practice, LCSW's are referred to by the title Internal Behavioral Health Consultant (IBHC).

8. Plaintiff Ms. Rumsey was at all relevant times a civilian employee of the United States Department of the Army until her constructive discharge on December 31, 2018.

9. Defendant the United States Department of the Army ("Department of the Army", or the "Agency") is a military department within the United States Department of Defense, and an agency of the federal government.

10. At all relevant times, Defendant Department of the Army has been an Executive agency as defined in 29 U.S.C. § 794.


**PROCEDURAL HISTORY AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

**Agency Docket No. ARSILL19MAR00821**

11. On February 14, 2019, Plaintiff initiated EEO Counselor contact.

12. She received a Notice of Right to File a formal complaint on May 20, 2019.

13. She filed a formal complaint within 15 days of receipt, on June 4, 2019.

14. The Agency dismissed her complaint on June 27, 2019.

15. Plaintiff subsequently filed an appeal with the Office of Federal Operations on August 9, 2019. (OFO Appeal No. 2019005886).

16. On December 6, 2019, the Office of Federal Operations issued a final decision on the appeal, reversing the Agency's dismissal and ordering the complaint remanded to the Agency.

17. The Agency investigated Ms. Rumsey's claims and issued a Final Agency Decision (FAD) on May 14, 2020, dismissing the complaint.

18. Plaintiff has not filed any appeal or petition with the Merit Systems Protection Board.

19. Plaintiff has not filed any grievance based on Union-negotiated grievance procedures.

20. Plaintiff took all necessary steps to exhaust her administrative remedies.

21. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on the Rehabilitation Act.

23. Venue is proper in the United States District Court for the Western District of Oklahoma pursuant to 28 U.S.C. §§ 1391(b)(2) because the Western District of Oklahoma is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTS

**Background**

24. Ms. Rumsey began work as a civilian employee of the Department of the Army at Reynolds Army Health Clinic (RAHC) on August 15, 2011.

25. Ms. Rumsey was an Internal Behavioral Health Consultant, a full-time consulting position focused on supporting primary care physicians in the treatment of active duty soldiers.

26. Ms. Rumsey's job was to provide support to their patients, around mental health issues, such as post-traumatic stress disorder (PTSD), anxiety, depression, as well as to work on the

behavioral aspects of chronic medical conditions, including diabetes, obesity, sleep disorders, and pain management.

27. Patients would be referred to Ms. Rumsey or her colleagues by primary care physicians.

28. IBHCs are also available to assist primary care physicians in dealing with emergency mental health situations throughout the clinics, and would be available to perform these duties during times where they were not providing individual patient care.

29. The primary duties of Ms. Rumsey's position included four main elements:

    a. Element 1: Screen and interview patients, and perform bio-psychosocial evaluation, using expert knowledge of general and specific concepts. Provide targeted assessment and evaluation including diagnostic impressions and functional status focused on the presenting problem. Meet passing criteria of IBHC core competencies as assessed by the clinic's expert trainer within 90 days of being able to see patients. Provide timely and succinct feedback to PCMs regarding consultations findings and recommendations.

    b. Element 2: Provide concise documentation of care and recommendations in patient's medical record in no more than 72 hours after the patient is seen.

    c. Element 3: Formulate behavioral health interventions appropriate to a primary care setting and assisting with implementation and monitoring of treatment plans with PCMs and BHCMs (Behavioral Health Care Managers). Provide focused follow-ups, including relapse - prevention education. Triage and referral of patients to Specialty Behavioral Health Care when appropriate. Provide on-going consultation services for a sub-set of patients who require on-going monitoring and follow-up (i.e., continuity consultations) with BHCMs where appropriate. Uses objective and measurable

outcomes to evaluate treatment effectiveness and make adjustments if appropriate for increased compliance and efficacy. Work as a primary care team member to develop specific clinical pathways or best practice programs for targeted patient groups (e.g. patients with acute stress syndrome and PTSD).

   d.   Element 4: Develop, teach, and provide oversight for classes that promote education and skill building to enhance psychological and physical health. Evaluate training opportunities and professional development activities.

**Development of Cubital Tunnel Syndrome and Initial Requests for Accommodation**

30. Shortly after starting work at RAHC, Ms. Rumsey developed cubital tunnel syndrome, as well as related injuries around the elbow, forearm and upper arm of the lateral and medial epicondyle, and/or other disabilities within the meaning of the Rehabilitation Act.

31. Cubital tunnel syndrome is an occupational disability, which means it is exacerbated by movement and can be managed with reasonable and appropriate accommodations.

32. Ms. Rumsey developed cubital tunnel syndrome as a result of the nature and quality of the computer equipment and office furniture that she was required to use.

33. Cubital tunnel syndrome is a chronic condition that flares up acutely when aggravated.

34. Cubital tunnel syndrome is a long-term impairment that is manageable with appropriate treatment but may become permanent without it.

35. Cubital tunnel syndrome is aggravated by bending the elbow, repetitive movements, or sustained contact with hard surfaces.

36. Recommended treatment includes resting the arm and limiting activity that aggravates the condition, as well as physical therapy.

37. Repeated aggravation and failure to obtain adequate treatment can lead to permanent damage to the nerve and a loss of function in the arm.

38. These disabilities made it difficult or impossible for Ms. Rumsey to fulfill her position duties without appropriate accommodations.

39. Ms. Rumsey made requests for reasonable accommodations as early as 2011, but these were ignored or denied.

40. Ms. Rumsey was instead offered inadequate and inappropriate alternatives to her requested accommodations that in fact exacerbated her injuries.

41. In 2014, Ms. Rumsey filed a complaint with the EEOC regarding her failure to obtain reasonable accommodations.

42. Although this complaint was dismissed, Ms. Rumsey was able to obtain a number of accommodations at this time, including a standing desk, access to voice transcription software for recording patient notes (which she would enter in the system at a later date) and short breaks between scheduled patients.

43. Ms. Rumsey continued in her role with these accommodations and received consistently excellent feedback from patients and managers at RAHC.

**Acute Flareups and Requests for Reasonable Accommodations Ignored**

44. In September 2017, Ms. Rumsey had an acute flareup of cubital tunnel syndrome.

45. This was due to the inadequacy of the accommodations Ms. Rumsey had been provided, which were not medically recommended or tailored to her medical needs.

46. In addition, Ms. Rumsey's accommodation of short, 15 minute breaks between patients was frequently ignored by her supervisor, CPT Rachel Jones.

47. Her schedule was changed by CPT Jones to have appointments scheduled with 5 minute breaks instead of the 15 minutes she required to allow for the inflammation to subside.

48. This caused her condition to worsen to a point where she was required to use ice packs throughout the day.

49. Ms. Rumsey made eight requests for accommodations to CPT Jones, beginning in September 19, 2017 until the end of December.

50. Her requests included, but were not limited to, the following:

   a. Request for CPT Jones to review the office set up so Ms. Rumsey could demonstrate the equipment that was causing issues;

   b. Request to see patients in group classes. This would have permitted her to see a greater number of patients;

   c. Request to change chair arms and desk height; and

   d. Request for another available position that would accommodate her disabilities.

51. These requests were ignored by CPT Jones.

52. CPT Jones treated Ms. Rumsey's disability as a nuisance, and told Ms. Rumsey in an oral conversation on September 6, 2017 that she had a "reputation for running to EEO."

53. Most of these accommodations focused on ways to position her arm differently, support for her arm, a different way to enter notes, a laptop to provide more flexibility for her arm movements, as well as doing classes as a required element of the IBHC model.

54. Her further requests in 2018, of which there were approximately eleven through June 2018, were ignored.

55. Ms. Rumsey emailed, at various times, LTC McGuire, Dr. Jones, the office manager Denise Edwards, and Col Maurer about concerns that Dragon, the voice transcription software with which she had been provided as an accommodation to avoid use of her arm, was not working.

56. She asked for assistance because her arm was swelling and in great pain.

57. She received no timely response.

58. On May 15, 2018, Ms. Rumsey emailed about concerns that her computer was not working and that as a result she was not able to get her notes completed.

59. She received no timely response.

60. On May 21, 2018, she again emailed with another request for continued ergonomic assistance help from Kevin Purcell, USAPHS, who had previously assisted her.

61. Mr. Purcell is a leading expert in ergonomics, and specialized to deal with the specific requirements of Ms. Rumsey's disability.

62. She received no timely response.

63. She was later told that this was because she had previously received "multiple ergonomic studies" and that she was not going to get any further support.

64. This was untrue. In fact, the "ergonomic studies" in question were evaluations by RAHC nursing staff who were not specialized in disability accommodation.

65. The primary purpose of these prior evaluations was to confirm that the equipment provided to Ms. Rumsey (standing desk) met the ADA standards for a commercial restaurant table, not that it was effective or conformed to her needs.

66. Ms. Rumsey was also told that having Mr. Purcell perform an evaluation was an extravagant and inappropriate expense.

67. In fact, Mr. Purcell had offered to come to RAHC with his medical team, at his own expense in order to perform an ergonomic evaluation for Ms. Rumsey if he was able to receive approval.

68. On June 29, 2018, she again emailed, explicitly requesting to engage in the interactive process, based on her doctor's temporarily restricting her to seeing four patients per day while sitting in a chair, leaving her available to do other tasks, such as classes or groups.

69. LTC McGuire said he would "look into it."

70. On information and belief, no subsequent action was taken by LTC McGuire to follow the interactive process.

71. The accommodations that were not granted exacerbated her disabilities and created risk of further injury.

72. These accommodations that were not granted were reasonable accommodations.

73. The Agency did not follow the interactive process required for addressing Ms. Rumsey's requests for accommodation.

74. Had the Agency followed the interactive process, Ms. Rumsey would have been able to perform all of the duties of the position.

75. Ms. Rumsey did, in fact, sustain further injury as a result of the conditions on her job.

76. Ms. Rumsey's injuries from this have continued to the present, and her injury is long-term, possibly permanent.

77. The reasonable accommodations that were not granted made it difficult or impossible for her to fulfill her position duties without inflammation and pain.

78. On July 23, 2018, she emailed LTC McGuire again asking for an interactive process, stating "I have asked numerous times for assistance, and it seems to have gone on deaf ears. My

injuries have worsened dramatically. I am asking for an interactive process, which includes me, to discuss possible solutions; - help with proper chair and desk adjustments, and create a plan."

79. On July 24, 2018, she received the following response from LTC McGuire: "categorically disagree. You've had multiple evals."

80. The fact that she had multiple evaluations in no way mitigated her right to have her chair and desk properly adjusted.

81. She replied the same day to explain that her requests for adjustment had never been addressed, despite the evaluations.

82. She explicitly noted that his statement that her desk met the ADA standards for a commercial restaurant table was irrelevant to her requests.

83. She received no response.

**Discriminatory Elimination of Ms. Rumsey's Full-Time Position**

84. Ms. Rumsey provided medical documents to the Agency from her physician, Dr. White, on June 29, 2018 that stated that she should temporarily not see more than 4 individual patients per day at her desk, not sit at her desk for more than 4 hours at a time, and use the other time to perform other tasks, such as group classes, during a course of physical and occupational therapy.

85. As a result of the Agency's refusal to appropriately consider her requested reasonable accommodations, Ms. Rumsey's condition worsened.

86. She was then determined not qualified for her position on the basis of injuries which would have been manageable but for this refusal.

87. The basis for the Agency's determination was that the position required having 10 timeslots for individual patients per day and Ms. Rumsey was not seeing 10 patients a day.

88. The Agency's determination was incorrect because the position description did not have as a requirement 10 timeslots for individual patients per day.

89. The average number of patients seen by an IBHC across the program was between 6 and 8 patients per day.

90. As noted in Ms. Rumsey's job description, the IBHC position is a consulting role, for which seeing individual patients constituted approximately half of the allotted time.

91. The IBHC position was intended to have a broad-base positive impact on health outcomes in the clinic and was designed to be flexible in how that impact was achieved.

92. By focusing on the number of individual patients seen rather than the number of individuals impacted, the Agency misconstrued the nature of the role.

93. In addition, had the Agency granted Ms. Rumsey's request to meet with patients as a group, in group classes, as was normally permitted to others similarly situated to Ms. Rumsey, she could have seen 10 patients per day.

94. Group classes had been a common practice at RAHC, and Ms. Rumsey had conducted group classes at RAHC in the past.

95. Ms. Rumsey made a request to the Agency for group meetings as a reasonable accommodation. The Agency denied Ms. Rumsey's request for group meetings.

96. On July 26, 2018, LTC McGuire told her that her full-time position was going to be taken away, because she was no longer able to do her essential job duties.

97. Instead, the Agency gave Ms. Rumsey the choice of taking a half-time position, at half her previous salary and pay for half of her own benefits, or removal from her position.

98. The half-time position included the same essential job duties Ms. Rumsey was allegedly unable to perform.

99. The Agency's action in giving Ms. Rumsey this choice was an adverse employment action. This adverse employment action was based on impermissible considerations, including Ms. Rumsey's disability.

100. This was incorrect, because she could perform her essential job duties, but on a temporary basis she needed an accommodation.

101. Ms. Rumsey could not financially afford to continue in her position as a part-time employee.

102. In particular, the loss of benefits associated with the part-time position would have been a significant impact on Ms. Rumsey's ability to afford the medical treatment related to her disability.

103. Ms. Rumsey was given two weeks to decide whether she would accept a part-time position.

104. On July 26, 2018, she requested modifications and extensions to the two-week job decision, given that she was preparing for a trip to see her daughter and meet with her treatment team.

105. LTC McGuire denied her request, stating that postponing her decision two weeks would impact the mission.

106. This is not a credible statement, given that there would have been ways to address the mission concerns, such as providing Ms. Rumsey with the opportunity to conduct group meetings.

107.    It is also not credible because LTC McGuire did not hire another IBHC to replace Ms. Rumsey for over 12 months following Ms. Rumsey's constructive discharge in December 2018.

108.    It is also not credible because while Ms. Rumsey was still employed, another full time IBHC position was fully funded but not posted for hiring.

**Retaliatory Instigation of Removal Process Against Ms. Rumsey**

109.    Tina Wayman, of Human Resources, emailed LTC McGuire on July 27, 2018, stating that leadership needed to comply with the temporary medical restrictions Dr. White had requested for Ms. Rumsey.

110.    LTC McGuire ignored this instruction.

111.    Ms. Rumsey's patient schedule had not been modified, from the time she provided the restrictions from Dr. White on June 29, 2018, as of August 1, 2018.

112.    Instead, he began a removal process but provided no modifications.

113.    In late August 2018, the arms of Ms. Rumsey's chair were removed in compliance with the medical recommendations of Dr. White and the instruction from Ms. Wayman of Human Resources.

114.    After this, Ms. Rumsey's inflammation subsided significantly and she no longer needed to ice her arm on a daily basis.

115.    As a result of the improvement in her condition, Ms. Rumsey began to increase her individual patient load.

116.    In spite of this improvement, September 28, 2018, Ms. Rumsey received a letter from LTC McGuire with the subject line "Job Offer Based on Medical Limitations".

117.    This letter indicated Ms. Rumsey would be employed on a part-time basis, working four hours a day consecutively from 7:30am to 11:30am.

118.    This offer did not include any of Ms. Rumsey's accommodations, even existing accommodations, such as the 15 minute breaks between patients.

119.    Ms. Rumsey was unable to accept this offer as it would have been detrimental to her health and her finances.

120.    The offer of a part-time position was rescinded and Ms. Rumsey was informed of her proposed removal on October 31, 2018.

**Constructive Discharge of Ms. Rumsey**

121.    Ms. Rumsey, faced with removal as a result of her disability, became concerned that she would not receive health benefits.

122.    In discussions with personnel from the Army Benefits Center – Civilians on October 17, 2018 and November 1, 2018, Ms. Rumsey was told that if she were medically removed, she would receive no health benefits, and her only option to receive health benefits was to retire.

123.    Ms. Rumsey was very concerned by that, because it would mean the loss of health benefits earned after seven years of good service.

124.    She advised COL Maurer of this by email on November 21, 2018.

125.    On a number of occasions prior to this, including but not limited to July 26, and November 21, COL Maurer suggested that Ms. Rumsey retire instead of resigning or being removed.

126.    COL Maurer told Ms. Rumsey that retirement would allow her to receive the health benefits she had earned.

127.    In fact, had Ms. Rumsey continued in her position, she would have received more substantial retirement benefits, including larger social security payments.

128.    Ms. Rumsey would have continued in her position had she not been placed in the position by the Agency of having to choose among a financially unviable part-time position, removal or retirement.

129.    The Agency was aware that Ms. Rumsey would have continued in her position had she not been put in this position by the Agency.

130.    Ms. Rumsey requested of Agency personnel that she would like to fill another full-time position, even potentially at a lower pay grade, within the Agency as a reasonable accommodation.

131.    The Agency failed or refused to act on this request for reasonable accommodation.

132.    The Agency's adverse employment action against Ms. Rumsey was substantially influenced by Ms. Rumsey's supervisor, CPT Jones.

133.    Ms. Rumsey continued to see patients and fulfill her job duties through December 2018.

134.    CPT Jones stated in a meeting on December 20, 2018 with leadership that she had been telling patients for some time that they could no longer use Ms. Rumsey as a provider.

135.    This limited Ms. Rumsey's ability to increase her patient load even as her condition improved.

136.    CPT Jones stated that she did so because, in her judgment, she felt that Ms. Rumsey was spending too much time with patients and that CPT Jones felt that she did not provide sufficient benefits to the patients.

137. CPT Jones' actions resulted in Ms. Rumsey having a larger number of no-shows or last-minute cancellations from patients whom she had been working with regularly and expected to fill her schedule.

138. CPT Jones did not tell Ms. Rumsey about these actions, and Ms. Rumsey was unaware of them until the meeting referenced above.

139. CPT Jones also stated that she was pleased that she was able to "push her out," referring to Ms. Rumsey's forced retirement based on the planned medical removal.

140. Unfortunately, although Ms. Rumsey had been assured by Agency personnel that the reasonable accommodations she requested would be referenced in the medical removal letter, which would have allowed her to obtain worker compensation benefits, she never received such a letter because she was forced to retire before that could be done.

141. Ms. Rumsey experienced a intolerable work environment at work because of her requests for reasonable accommodation of her disability (Cubital Tunnel Syndrome and related nerve injuries), and in retaliation for her complaints.

142. She made formal complaints regarding her treatment, which were ignored or dismissed.

143. The Department of the Army found fault with Ms. Rumsey because her disability required reasonable accommodations.

144. The Department of the Army failed to provide Ms. Rumsey with reasonable accommodations.

145. Administrators at RAHC created an intolerable and hostile work environment for Ms. Rumsey.

146. The Department of the Army did not take prompt and effective action to resolve Ms. Rumsey's concerns.

147.   The forced removal of Ms. Rumsey from her full-time position was discriminatory adverse action by the Agency because of her disability, and in retaliation for her complaints to HR and management regarding her need for reasonable accommodations.

148.   As a result of the discrimination, the hostile work environment and the adverse action taken against Ms. Rumsey on the basis of her disability and in retaliation for her opposition to discrimination, Ms. Rumsey found herself in an environment so hostile to her disability that no reasonable person would continue in such an environment.

149.   For this reason, Ms. Rumsey retired from her position on December 31, 2018.

150.   This involuntary resignation amounts to a constructive discharge by the Agency.


**CAUSES OF ACTION**
**COUNT 1**
**Rehabilitation Act**
**29 U.S.C. § 701 et seq.**
**Failure to Provide Reasonable Accommodations**

151.   Plaintiff Ms. Rumsey incorporates by reference all previous paragraphs as if fully set forth herein.

152.   Ms. Rumsey is a protected individual within the meaning of the Rehabilitation Act.

153.   Ms. Rumsey has a physical impairment that substantially limits one or more of her major life activities.

154.   Ms. Rumsey is limited in her ability to use her arm due to her disability.

155.   She no longer plays the piano as a result of her disability.

156.   She is unable to sit comfortably in a chair that has arms.

157.    She is restricted in her ability to use a keyboard and for this reason uses voice transcription software, Dragon, to record her patient notes and enter them into the system.

158.    These are severe restrictions Ms. Rumsey faces in performing activities that are central to most people's lives: engagement in hobbies, sitting in one position and typing at a computer.

159.    Ms. Rumsey made a record of her impairments with the Agency through her numerous requests for accommodation.

160.    Ms. Rumsey was regarded as having an impairment by her supervisors and colleagues at RAHC.

161.    Ms. Rumsey's requirement of using ice to counter inflammation, her use of a sling when she suffered acute flare ups, as well as the restricted movement in her arm, were visible indications of her impairment.

162.    Ms. Rumsey's job duties are described in Paragraph 29. Ms. Rumsey was qualified to perform each of these duties.

163.    Defendant Department of the Army repeatedly failed to provide Ms. Rumsey with effective reasonable accommodations.

164.    If more than one accommodation is effective, although the preference of the individual with a disability should be given primary consideration, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations.

165.    The accommodation offered to Ms. Rumsey of a half-time position was not effective.

166.    In fact, this alleged accommodation eliminated existing, effective accommodations for Ms. Rumsey, such as the 15-minute breaks between patients.

167.    If Ms. Rumsey had accepted this accommodation, her impairment would have been exacerbated and could potentially cause permanent damage to her nerve, leading to total loss of arm function.

168.    Ms. Rumsey's requests for consideration of alternatives, including a lower paid position which included her existing accommodation, were dismissed or ignored.

169.    As a direct and proximate result of Defendant Department of the Army's failure to provide reasonable accommodations, Ms. Rumsey has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 2**
**Rehabilitation Act**
**29 U.S.C. § 701 et seq.**
**Constructive Discharge Because of Disability**

170.    Plaintiff Ms. Rumsey incorporates by reference all previous paragraphs as if fully set forth herein.

171.    Ms. Rumsey is a protected individual within the meaning of the Rehabilitation Act.

172.    Ms. Rumsey has a physical impairment that substantially limits one or more of her major life activities.

173.    Ms. Rumsey is limited in her ability to use her arm due to her disability.

174.    She no longer plays the piano as a result of her disability.

175.    She is unable to sit comfortably in a chair that has arms.

176.    She is restricted in her ability to use a keyboard and for this reason uses voice transcription software, Dragon, to record her patient notes and enter them into the system.

177.    These are severe restrictions Ms. Rumsey faces in performing activities that are central to most people's lives: engagement in hobbies, sitting in one position and typing at a computer.

178.    Ms. Rumsey made a record of her impairment with the Agency through her numerous requests for accommodation.

179.    Ms. Rumsey was regarded as having an impairment by her supervisors and colleagues at RAHC.

180.    Ms. Rumsey's requirement of using ice to counter inflammation, her use of a sling when she suffered acute flare ups, as well as the restricted movement in her arm, were visible indications of her impairment.

181.    Ms. Rumsey's job duties are described in Paragraph 29. Ms. Rumsey was qualified to perform each of these duties.

182.    Defendant Department of the Army terminated Ms. Rumsey because of disability, specifically Ms. Rumsey's Cubital Tunnel Syndrome and related nerve injuries.

183.    Defendant Department of the Army deliberately created working conditions that a reasonable person would perceive to be intolerable based on Ms. Rumsey's disability.

184.    These conditions included, but were not limited to, harassment, humiliation, retaliation, the elimination of her full-time position, a failure to provide or even consider the reasonable accommodations requested, and the initiation of a removal process.

185.    Ms. Rumsey perceived the working conditions that Defendant Department of the Army created to be intolerable.

186.    Defendant Department of the Army created these intolerable working conditions with the intention of forcing Ms. Rumsey to resign her position.

187.    Retirement was offered to Ms. Rumsey as an alternative to removal or resignation.

188.    Because of the intolerable working conditions Defendant Department of the Army created, Ms. Rumsey was forced to retire.

189.    As a direct and proximate result of Defendant Department of the Army's constructive discharge, Ms. Rumsey has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

## RECOVERY OF ATTORNEY FEES AND COSTS

190.    Plaintiff is entitled to recover her attorneys' fees and costs pursuant to provisions of Section 505 of the Rehabilitation Act, 29 U.S.C. § 794(b).

## JURY DEMAND

191.    Plaintiff hereby demands a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Declare that the acts, practices, and omissions complained of herein are unlawful and violate the Rehabilitation Act;

B.  Permanently enjoin Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with her from engaging in the unlawful conduct of discriminating against employees based on disability;

C.  Order Defendant to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees who are disabled, and which eradicate the effects of Defendant's past and present unlawful employment practices;

D.  Order other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

E.  Order Defendant to re-hire Plaintiff and restore her to her job with back benefits, retirement contributions etc., and to make her whole;

F.  Direct Defendant to pay for past and future non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

G.  Direct Defendant to pay Plaintiff back pay, in an amount to be determined at trial;

H.  Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law;

I.  Award such additional relief as justice may require.

Dated: June [ ], 2020.

Respectfully submitted,

 *s/ Jerry L. Colclazier*
Jerry L.  Colclazier
COLCLAZIER & ASSOCIATES
404 N. Main St.
Seminole, OK 74868
(405) 382-1212
(405) 382-1214 (fax)
jerry@colclazier.com

*Attorney for the Plaintiff*

*s/ Jillian T. Weiss, Esq.*
(signed by Filing Attorney with permission)
Jillian T. Weiss, Esq.
Law Office of Jillian T. Weiss, P.C.
76 Charles Street, No. 1E
New York, New York 10014
(845) 709-3237
Fax (845) 684-0160
jweiss@jtweisslaw.com

*Attorney for the Plaintiff*
*(Pro hac vice motion forthcoming)*